# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | P. Michael Mahoney | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 50032 | **DATE** | 11/17/2003 |
| **CASE TITLE** | | Rance vs. Barnhart | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons stated on the attached Memorandum Opinion and Order, the ALJ's decision to deny benefits to Plaintiff is sustained. The ALJ is affirmed at all steps of the disability determination process as outlined above. Plaintiff's Motion for Summary Judgment to the administrative record and pleadings is denied. Defendant's Motion for Summary Judgment is granted.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | **Document Number** |
| ✓ | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | NOV 17 2003 date docketed | |
| | Docketing to mail notices. | | | 18 |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 11/17/2003 date mailed notice | |
| | | courtroom deputy's initials | | |
| sp | | | sp mailing deputy initials | |

CLERK, U.S. DISTRICT COURT

03 NOV 17 AM 11:25

FILED - WB

Date/time received in central Clerk's Office

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# WESTERN DIVISION

JUDITH E. RANCE,                          )
                                          )
    **Plaintiff,**                        )       Case No. 03 C 50032
                                          )
    v.                                    )       Magistrate Judge
                                          )       P. Michael Mahoney
JO ANNE B. BARNHART,                      )
COMMISSIONER OF SOCIAL                    )
SECURITY,                                 )
                                          )
    **Defendant.**                        )

## MEMORANDUM OPINION AND ORDER

    Judith Rance ("Plaintiff") seeks judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner"). *See* 42 U.S.C. §§ 405(g), 1383(c)(3). The Commissioner's final decision denied Plaintiff's application for Supplemental Security Income ("SSI") pursuant to Title XVI of the Social Security Act (the "Act"). 42 U.S.C. §1381(a). This matter is before the Magistrate Judge pursuant to consents filed by both parties on April 7, 2003. *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

## I.    BACKGROUND

    Plaintiff filed for SSI on November 11, 2000, alleging disability on October 1, 1998. (Tr. 114). Plaintiff's application for benefits was denied on January 2, 2001. (Tr. 51). On February 23, 2001, Plaintiff filed a request for reconsideration. (Tr. 55). Plaintiff's request for reconsideration was denied on April 13, 2001. (Tr. 56). Plaintiff then filed a request for a hearing before an Administrative Law Judge ("ALJ") on June 20, 2001. (Tr. 59). Plaintiff appeared, with counsel, before an ALJ on April 17, 2002. (Tr. 19). In a decision dated April 26, 2002, the ALJ found that Plaintiff was not entitled to SSI. (Tr. 18). On May 1, 2002, Plaintiff requested a review of the ALJ's

decision by the Appeals Council. (Tr. 8). On December 30, 2002, the Appeals Council denied Plaintiff's request for review. (Tr. 5).

## II.   FACTS

Plaintiff was born on March 12, 1941 and was sixty one years old at the time of her April 26, 2002 hearing. (Tr. 26). According to her own testimony, Plaintiff graduated from high school and then received LPN training. (Tr. 28). At the time of the hearing, Plaintiff was divorced and living with her eighty year old aunt and her two grandchildren. (Tr. 27). Plaintiff suffers from numerous conditions and ailments and it is for these reasons that Plaintiff has filed for SSI.

Although unclear from her testimony as to exact dates, Plaintiff appears to have worked as a LPN dental assistant and at a retirement home. (Tr. 28). Additionally, Plaintiff appears to have worked in retail sales in Machesney Park, Illinois. (Tr. 29). Apparently, Plaintiff got the job in Machesney Park through the Rock River Training program, but was unable to continue her employment due to the physical nature of the jobs. (Id.). Lastly, Plaintiff appears to have worked for the Northwestern Illinois Area Agency on Aging ("NIAA") in 1997 and 1998. (Tr. 30). Plaintiff worked for the Human Resources Department performing general office assistant duties. (Id.). Again, as stated above, Plaintiff, and the ALJ for that matter, were not clear in the dates of each job but it appears that Plaintiff has not worked as a dental assistant since before 1975 and has not worked as an LPN[1] since the mid to late 1980's. (Tr. 42). Plaintiff's last job was with NIAA in 1998. (Tr. 30).

When asked about her day-to-day problems, Plaintiff stated that she has problems "trying to keep pace" because her "body can't keep up with the pace." (Id.). Specifically, Plaintiff testified

---

[1] Plaintiff later stated that she no longer has her LPN license. (Tr. 43).

that she does not have enough energy to do what she likes and that it sometimes takes her two or three days to do something that should normally be done in one. (*Id.*).

Plaintiff is always in pain. (Tr. 31). Plaintiff's pain generates throughout her whole body but is specifically debilitating in her back. (*Id.*). Plaintiff described the pain in her back to a feeling like someone "consistently just gnawing on me or the muscles are just tight there all the time, and I ache." (*Id.*).

Plaintiff also has problems with her left hand. (Tr. 32). Specifically, Plaintiff stated that she has numbness and tingling in her left hand with discoloration of her fingers. (*Id.*). The numbness in Plaintiff's hand usually lasts approximately a half hour and usually happens approximately two to three times a week. (*Id.*). Although sometimes triggered by coldness, Plaintiff stated that the numbness and tingling can occur without coldness or without use of her left hand. (*Id.*).

In addition to the pain in her back and the numbness in her left hand, Plaintiff stated that she sometimes experiences vertigo. (Tr. 34). This usually occurs once a week and Plaintiff takes Meclizine if she feels an attack coming on. (*Id.*). Plaintiff had been experiencing the vertigo for one year prior to her hearing.

In terms of her day-to-day activities, Plaintiff stated that her eighty year old aunt takes care of most of the household chores, but that Plaintiff tries to help out as much as possible. (Tr. 38). Specifically, Plaintiff testified that she can do the laundry, some cooking and grocery shopping (couple times a week). Neither Plaintiff nor her aunt take care of the outside of the house. Apparently, a service takes care of the landscaping and general lawn duties. (Tr. 39).

Vocational expert, Susan Entenberg, testified at Plaintiff's April 2002 hearing. As an initial matter, Ms. Entenberg stated that a LPN is considered to be semi-skilled and medium in terms of

3

exertional level. (Tr. 44). Additionally, without additional training, a LPN does not yield any transferable skills to light or sedentary work. (*Id.*). The ALJ then asked Ms. Entenberg to consider a person of Plaintiff's age with "high school education plus ... LPN education. Who ... is limited to lifting up to 20 pounds frequently ... but no more then 20 pounds." (*Id.*). After giving Ms. Entenberg the hypothetical, the ALJ started to ask questions regarding the difference between medium and light work. Specifically, the ALJ asked whether "anything over 20 pounds occasionally moves into medium, right." (*Id.*). Ms. Entenberg answered that medium exertion requires the ability to lift up to 50 pounds, to which the ALJ asked "Does every medium job require you to lift up to 50 pounds?" (*Id.*). Ms. Entenberg responded "yes," to which the ALJ inquired as to whether there are some jobs that require more then occasional lifting of 20 pounds, but less then the 50 pounds required for medium exertion. (Tr. 45). Ms. Entenberg responded in the affirmative to which the ALJ stated "that's what I'm trying to explore." (*Id.*).

After this exchange, Ms. Entenberg, based on the ALJ's narrow questioning, responded that there are some machine operator jobs and packer jobs (20, 000 in the Chicago Metropolitan Area) where the worker is required to lift 20 to 25 pounds throughout the day. (*Id.*). The ALJ then modified the hypothetical to include an individual who "can not work in extremes of temperature and can't work at unprotected heights, or operate dangerous moving machinery." (*Id.*). Ms. Entenberg responded that because many machine operator and packer jobs require machine operation, such a limitation would reduce the number of jobs by at least fifty to seventy percent. (Tr. 46). Lastly, the ALJ asked Ms. Entenberg whether the above referenced jobs were production jobs that required a consistent pace, and if so, would a person who was unable to maintain pace for whatever reason last very long. Ms. Entenberg answered no, such a person would not last very long

4

if they were unable to keep up the pace of the production.

Plaintiff's attorney then asked the ALJ what affect there would be on the above mentioned jobs if the hypothetical person was not able to use their left hand for twenty to thirty minutes two to three times a week. Ms. Entenberg responded that such a person would not be able to perform the above mentioned jobs because of the lifting requirement and the repetitiveness of those jobs. (Tr. 47).

## III.   **MEDICAL HISTORY**

The earliest medical report before this court is dated August 18, 1995. (Tr. 199). On that date, Plaintiff saw Dr. Sina Bahmanyar of the Rockford Retina Clinic. (*Id*.). Dr. Bahmanyar reported that Plaintiff complained of seeing "lightning bugs and a ripple effect" with double vision. (*Id*.). Plaintiff continued to see Dr. Bahmanyar for her eye problems. On April 22, 1996, Dr. Bahmanyar diagnosed Plaintiff as suffering from conjunctivitis. (Tr. 204). Plaintiff saw Dr. Bahmanyar on September 4, 1996. (Tr. 206). Dr. Bahmanyar reported that Plaintiff had a red and yellowish greenish discharge from her eye. (*Id*.).

On February 4, 1999, Dr. D.M. Roelke, of the Rockford Clinic, had an x-ray of Plaintiff's spine taken. (Tr. 275). The x-ray revealed that there was levoscoliosis in the lumbar spine with an associated degenerative change. (*Id*.). Additionally, there was narrowing of Plaintiff's L2-3 and L3-4 intervertebral disc spaces with associated osteophyte formation. (*Id*.). Oblique views of Plaintiff's spine demonstrated significant facet hypertrophy at the L4-5 and L5-S1 levels bilaterally. (*Id*.).

On April 12, 2000, Plaintiff saw Dr. Wen Guo who reported that Plaintiff came in because of urinary incontinence. (Tr. 152). Dr. Guo reported that Plaintiff had severe hypothyroidism because of noncompliance and was taking thyroid medicine, but not consistently. (*Id*.). Dr. Guo also

reported that Plaintiff has energy but her hearing was not good. Ultimately, Dr. Guo diagnosed Plaintiff as suffering from urinary incontinence secondary to urinary tract infection and hearing loss and dizziness. (*Id.*).

Plaintiff saw Dr. Guo again a month later on May 12, 2000. (Tr. 153). Dr. Guo reported that Plaintiff lost seven pounds in one month and still was suffering from urinary incontinence. (*Id.*). Dr. Guo's impressions of Plaintiff were that she had hypothyroidism on replacement, weight loss with a poor appetite, and urinary urgency and incontinence. (*Id.*). Dr. Guo also indicated that he thought Plaintiff was suffering from depression. (*Id.*).

Plaintiff saw Dr. Guo again eight days later. (Tr. 154). Plaintiff returned to Dr. Guo because she was complaining that her left index finger felt cold and turned purple and then white (a problem that Plaintiff had been experiencing for some time). Dr. Guo's impressions of Plaintiff were that she was suffering from proteinuris, most likely secondary to hypertension, hypertension, possible Raynaud's phenomenon, and hypothyroidism on replacement. (*Id.*).

Plaintiff saw Dr. Stephen Bernsten of Swedish American Hospital on September 25, 2000. (Tr. 169). Dr. Bernsten reported that Plaintiff has a history of gross hematuria and an initial KUB demonstrated an approximately 8 mm oblong density which projects over the middle pole of the right kidney. (*Id.*). Additionally, Dr. Bernsten indicated that Plaintiff had some scattered phleboliths within the left hemipelvis and convex-to-the left acoliosis. (*Id.*).

Plaintiff started seeing Dr. Thomas Schiller on October 19, 2000. (Tr. 178). Dr. Schiller performed a physical on Plaintiff which indicated that Plaintiff's neck was supple with no JVD, thyromegaly, lymphadenopathy or carotid bruits. Plaintiff's lungs were clear with no wheezing, rales or rhonchi. (*Id.*). Plaintiff's heart had a regular rate and rhythm and her abdomen had normal active

6

bowel sounds with no hepatosplenomegaly or masses. (*Id.*). However, Dr. Schiller reported that Plaintiff suffers from possible hypertension and recommended that Plaintiff take blood pressure medicine to keep her heart rate within normal range. (Tr. 179).

Plaintiff went to the Swedish American Hospital Emergency Room on October 23, 2000 complaining of leg pain. (Tr. 177). Dr. John Stranig, an Emergency Room physician, reported that Plaintiff indicated that she bumped her leg on a door a few days ago and was experiencing increased tenderness in the anterior part of her leg. (*Id.*). An examination of Plaintiff's leg revealed that there was no calf tenderness, no swelling, no thigh tenderness, but on the anterior aspect of the tibia, there was a small hematoma noted. (*Id.*). Dr. Stranig diagnosed Plaintiff as suffering from a contusion hematoma with secondary cellulitis of the left lower extremity. (*Id.*).

Plaintiff's health began to apparently worsen in November 2000. (Tr. 181). On November 6, 2000, Dr. Schiller reported that Plaintiff's fatigue and malaise had worsened over the past weeks and that Plaintiff indicated that her mental status had changed. (*Id.*). Dr. Schiller also reported that Plaintiff had little energy, muscle weakness, fatigue, and muscle aches. Ultimately, Dr. Schiller reported Plaintiff suffered from known hypothyroidism (with questions about whether or not Plaintiff has been taking her medicines faithfully), fatigue and malaise coupled with weight loss, and post polio syndrome. (*Id.*).

Plaintiff experienced a rapid heart beat on November 19, 2000. (Tr. 192, 1995). Dr. Jeffrey Schleich and Dr. John Underwood saw Plaintiff on November 19, 2000. Dr. Schleich reported that Plaintiff had hypokalemia, a right carotid bruit and a kidney stone with hematuria. (Tr. 193). Dr. Underwood reported that Plaintiff's EKG revealed nonspecific ST changes inferiorly with no acute ST segmen of T wave changes. (Tr. 195).

7

Dr. Allison Harbour, of Swedish American, saw Plaintiff on November 21, 2000. (Tr. 190). Dr. Harbour reported that Plaintiff was put on telemetry to monitor cardiac status. (*Id.*). Plaintiff's potassium was monitored and was brought to a normal level and her blood pressure was normal and hydrochlorothiazide was held. (*Id.*).

On November 7, 2000, a C. Enos filled out a Disability Report on Plaintiff. (Tr. 122). Enos reported that Plaintiff had no difficulties with hearing, reading, breathing, understanding, coherency, concentrating, talking, answering, sitting, standing, walking, seeing, using hands, and writing. (Tr. 124). Enos also reported that Plaintiff had no problem and was in no pain putting her arms up to shoulder level to show how she stocked shelves. (*Id.*).

Plaintiff saw Dr. Schiller again on January 10, 2001. (Tr. 233). Dr. Schiller reported that Plaintiff's past and current medical condition consisted of hypothyroidism, nephrolithiasis, menopause, and retinal detachment with some macular degeneration effecting the left eye. (*Id.*). Dr. Schiller also reported that Plaintiff suffered from decreased energy and weight loss and because Plaintiff has a family history of colon cancer, Dr. Schiller indicated that there was a worry for such ailments. (*Id.*).

Plaintiff saw Dr. Kevin Gander, of Swedish American Medical Group, on February 17, 2001. (Tr. 237). Dr. Gander indicated that he saw Plaintiff because she complained of palpitations. Dr. Gander's evaluation of Plaintiff revealed that her neck was supple with no lymphadeonopahty or thyromegaly, her lungs were clear and her heart was regular without murmurs, rubs or gallops. Dr. Gander reported that Plaintiff will need to get a BMP and TSH to determine if Plaintiff's medication needed to be altered. (*Id.*).

Plaintiff returned to Dr. Schiller on March 29, 2001 complaining of a rapid heart beat. (Tr.

239). Plaintiff indicated to Dr. Schiller that she had no light headiness or shortness of breath, no chest pain, nausea or vomiting, and no undue stress. (*Id.*). Dr. Schiller recommended that Plaintiff needed to obtain a thyroid cascade, a basic metabolic profile, and an urinalysis. (*Id.*). Plaintiff saw Dr. Schiller again on April 4, 2001. (Tr. 241). Dr. Schiller reported that Plaintiff was doing much better and her energy had increased. (*Id.*). Her palpitations had completely resolved. (*Id.*). However, on April 12, 2001, Plaintiff returned to Dr. Gander complaining that her palpitations had returned. (Tr. 242). Dr. Gander limited Plaintiff's Ziac medication intake. (*Id.*).

On June 11, 2001, Dr. Edward Steffen of the Department of Medical Imaging, performed a chest exam on Plaintiff. (Tr. 269). Plaintiff's chest exam revealed a severe S-shaped scoliosis at her thoracolumbar spine. (*Id.*). The exam also revealed that Plaintiff's heart was within normal limits and that there was bibasilar interstitial prominence/thickening as well as a tiny left upper lobe granuloma. (*Id.*).

Plaintiff's feeling of tiredness and weakness returned in July 2001. (Tr. 245). On July 2, 2001, Plaintiff saw Dr. Brian Knabe, of Swedish American Medical Group. (*Id.*). Plaintiff indicated to Dr. Knabe that she was feeling weak and tired and continued to have sharp, stabbing pains in her chest. (*Id.*). Dr. Knabe reported that Plaintiff's chest pains appeared to be musculoskeletal and prescribed 500 mgs of Naprosyn. (*Id.*). Plaintiff continued to see Dr. Schiller and Dr. Gander regarding her hypertension and hypothyroidism with no remarkable medical reports filed.

An Ability to Do Work-Related Activities assessment was done on Plaintiff by Dr. S. Bahmanyar, an Opthamalogist. (Tr. 224-227). Dr. Bahmanyar opined that Plaintiff could lift/carry twenty pounds occasionally and twenty pounds frequently. (Tr. 224). Additionally, Dr. Bahmanyar indicated that Plaintiff was limited in her upper extremities due the retinal detachment in her left eye.

9

(Tr. 225). No other exertional, postural, manipulative or environmental limitations were noted.

On April 10, 2002, Dr. Schiller wrote a letter to the ALJ regarding Plaintiff. (Tr. 276). Dr. Schiller wrote that Plaintiff has "multiple medical problems including post-polio syndrome, macular degeneration, hyperthyroidism and hyperglycemia" (*Id.*). Additionally, Dr. Schiller wrote that Plaintiff "has significant fatigue" due to her numerous medical problems. (*Id.*). In concluding his letter, Dr. Schiller wrote "I find it unlikely that [Plaintiff] would be able to engage in any meaningful employment due to her medical conditions." (*Id.*). However, Dr. Schiller also acknowledged that he does not do formal disability evaluations. (*Id.*).

## IV.    **STANDARD OF REVIEW**

The court may affirm, modify, or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). Review by the court, however is not *de novo*; the court "may not decide the facts anew, reweigh the evidence or substitute its judgment for that of the [ALJ]." *Binion v. Charter*, 108 F.3d 780, 782 (7th Cir. 1997); *see also Maggard v. Apfel*, 167 F.3d 376, 379 (7th Cir. 1999). The duties to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide the case accordingly are entrusted to the commissioner; "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision rests with the Commissioner." *Schoenfeld v. Apfel*, 237 F.3d 788, 793 (7th Cir. 2001). If the Commissioner's decision is supported by substantial evidence, it is conclusive and this court must affirm. 42 U.S.C. §405(g); *see also Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). "Substantial evidence" is "evidence which a reasonable mind would accept as adequate to support a conclusion." *Binion*, 108 F.3d at 782.

10

The Seventh Circuit demands even greater deference to the ALJ's evidentiary determinations. So long as the ALJ "minimally articulate[s] his reasons for crediting or rejecting evidence of disability," the determination must stand on review. *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992). Minimal articulation means that an ALJ must provide an opinion that enables a reviewing court to trace the path of his reasoning. *Clifford v. Apfel*, 227 F.3d 863, 874 (7th Cir. 2000); *Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir. 1996). Where a witness credibility determination is based upon the ALJ's subjective observation of the witness, the determination may only be disturbed if it is "patently wrong" or if it finds no support in the record. *Pope v. Shalata*, 998 F.2d 473, 487 (7th Cir. 1993). "However, when such determinations rest on objective factors of fundamental implausibilities rather than subjective considerations, [reviewing] courts have greater freedom to review the ALJ's decision." *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994).

## V.    **FRAMEWORK FOR DECISION**

The ALJ concluded that Plaintiff did not meet the Act's definition of "disabled," and accordingly denied her application for benefits. "Disabled" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(3)(A). A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c(3)(C). *See Clark v. Sullivan*, 891 F.2d 175, 177 (7th Cir. 1988).

The Commissioner proceeds through as many as five steps in determining whether a claimant

11

is disabled. 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f) (1998).[2] The Commissioner sequentially determines the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments; (4) whether the claimant is capable of performing work which the claimant performed in the past; and (5) whether the claimant is capable of performing any other work in the national economy.

At Step One, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520 (a),(b). Substantial gainful activity is work that involves doing significant and productive physical or mental duties that are done, or intended to be done, for pay or profit. 20 C.F.R. § 404.1510. If the claimant is engaged in substantial gainful activity, he is found not disabled, regardless of medical condition, age, education, or work experience, and the inquiry ends; if not, the inquiry proceeds to Step Two.

Step Two requires a determination whether the claimant is suffering from a severe impairment.[3] A severe impairment is one which significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). The claimant's age, education, and work experience are not considered in making a Step Two severity determination. 20 C.F.R. § 404.1520(c). If the claimant suffers from severe impairment, then the inquiry moves on to Step

---

[2] The Commissioner has promulgated parallel regulations governing disability determinations under Title II and Title XVI. See 20 C.F.R. Ch. III, Parts 404, 416. For syntactic simplicity, future references to Part 416 of the regulations will be omitted where they are identical to Part 404.

[3] The claimant need not specify a single disabling impairment, as the Commissioner will consider the combined affect of multiple impairments. See, e.g., 20 C.F.R. § 404.1520(c). For syntactic simplicity, however, this generic discussion of the Commissioner's decision-making process will use the singular "impairment" to include both singular and multiple impairments.

Three; if not, then the claimant is found to be not disabled, and the inquiry ends.

At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R. Ch. III, Part 404, Subpart P, Appendix 1. The listings describe, for each of the major body systems, impairments which are considered severe enough *per se* to prevent a person from doing any significant gainful activity. 20 C.F.R. §§ 404.1525(a). The listings streamline the decision process by identifying certain disabled claimants without need to continue the inquiry. *Bowen v. New York*, 476 U.S. 467, 470-71 (1986). Accordingly, if the claimant's impairment meets or is medically equivalent to one in the listings, then the claimant is found to be disabled, and the inquiry ends; if not, the inquiry moves on to Step Four.

At Step Four, the Commissioner determines whether the claimant's residual functional capacity allows the claimant to return to past relevant work. Residual functional capacity is a measure of the abilities which the claimant retains despite his impairment. 20 C.F.R. § 404.1545(a). Although medical opinions bear strongly upon the determination of residual functional capacity, they are not conclusive; the determination is left to the Commissioner, who must resolve any discrepancies in the evidence and base a decision upon the record as a whole. 20 C.F.R. § 404.1527(e)(2); *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). Past relevant work is work previously performed by the claimant that constituted substantial gainful activity and satisfied certain durational and recency requirements. 20 C.F.R. § 404.1565; Social Security Ruling 82-62. If the claimant's residual functional capacity allows him to return to past relevant work, then he is found not disabled; if he is not so able, the inquiry proceeds to Step Five.

At Step Five, the Commissioner must establish that the claimant's residual functional capacity allows the claimant to engage in work found in significant numbers in the national

13

economy. 20 C.F.R. §§ 404.1520(f), 404.1566. The Commissioner may carry this burden by relying

upon vocational expert testimony, or by showing that a claimant's residual functional capacity, age,

education, and work experience coincide exactly with a rule in the Medical-Vocational Guidelines

(the "grids"). *See* 20 C.F.R. Ch. III, Part 404 Subpart P, Appendix 2; *Walker v. Bowen*, 834 F.2d

635, 640 ( 7th Cir. 1987); Social Security Law and Practice, Volume 3, § 43:1. If the ALJ correctly

relies on the grids, vocational expert evidence is unnecessary. *Luna v. Shalala,* 22 F.3d 687, 691-92

(7th Cir. 1994). If the Commissioner establishes that sufficient work exists in the national economy

that the claimant is qualified and able to perform, then the claimant will be found not disabled; if not,

the claimant will be found to be disabled.

## VI.    ANALYSIS

The court will proceed through the five step analysis in order.

A. Step One: Is the claimant currently engaged in substantial gainful activity?

In performing the Step One Analysis the ALJ found that Plaintiff had not engaged in any

substantial gainful activity at any time relevant to his decision issued on April 26, 2002. (Tr. 14).

Specifically, the ALJ found that "there is no evidence of work after the application date in this case."

(*Id.*).

Under ordinary circumstances, a claimant is engaged in substantial gainful activity if the

claimant's earnings averaged more than seven hundred and eighty dollars per month for years after

January 1, 2001. (20 C.F.R. § 1574 (b) (2) Table 1, as modified by 65 FR 82905, December 29,

2000).

The finding of the ALJ as to Step One of the Analysis is not challenged by either party and

the court finds no reason to disturb this finding. The ALJ's determination as to Step One of the

Analysis is affirmed.

B. Step Two: Does the claimant suffer from a severe impairment?

In performing the Step Two Analysis the ALJ found Plaintiff suffered from severe impairments. Specifically, the ALJ found Plaintiff had the following medically determinable impairments: hypothyroidism; hypertensive cardiovascular disease; scoliosis; history of retinal detachment and macular degeneration; episodic dizziness; and possible Raynaud's syndrome. (Tr. 17.). However, the ALJ stated that while the Plaintiff does have "at least one medically determinable impairment ... there is an allegation of an impairment for which there exists no objective medical support whatsoever; specifically, post-polio syndrome. Since this alleged impairment is supported only by the [Plaintiff's] statement of symptoms, rather than by 'signs, symptoms, and laboratory finding,' it is not medically determinable and need be given no further consideration ... ." (Tr. 14).

Substantial evidence exists to support the ALJ's determination that Plaintiff suffers from severe impairments. This finding is not challenged by either party and the court finds no reason to disturb it. The ALJ's finding as to Step Two of the Analysis is affirmed.

C.      Step Three: Does claimant's impairment meet or medically equal an impairment in the Commissioner's listing of impairments?

In performing the analysis for Step Three the ALJ determined that Plaintiff's impairments do not meet or equal any impairment in Appendix 1 to Subpart P of Regulations number 4. (Tr. 14). The ALJ found that, although the Plaintiff has hypertension, "it is not accompanied by significant end organ damage or any of the other requirements listed in section 4.02 or 4.04. Even considering the combination of the [Plaintiff's] impairments, the level of severity does not equal that contemplated for any of the impairments in Appendix 1." (*Id.*).

15

Substantial evidence exists to support the ALJ's finding and this court finds no reason to disturb it. Therefore, the ALJ's determination as to Step Three of the Analysis is affirmed.

D.      Step Four: Is the claimant capable of performing work which the claimant performed in the past?

Before performing the analysis for Step Four, the ALJ first determined Plaintiff's RFC. The ALJ determined that Plaintiff's medically determinable impairments preclude lifting more than twenty pounds; however, the ALJ did find that Plaintiff can lift no more then twenty pounds continuously and repetitively. (Tr. 14). Additionally, the ALJ found that while Plaintiff has hypothyroidism, the condition is controlled by medication. (Tr. 15). Further, Plaintiff has severe scoliosis but there are no related clinical findings and physical examinations do not elicit any associated tenderness or limitation in range of motion and Plaintiff takes no pain relieving medication. (*Id.*). Next, the ALJ noted that Plaintiff does have a history of macular degeneration and retinal detachments but Plaintiff's visual acuity is 20/40 to 20/50. (*Id.*). Plaintiff's episodic dizziness is controlled by medication and Plaintiff's one-time complaint of cold and numbness in her left hand is not backed up by any documented evidence. (*Id.*).

Additionally, while Plaintiff has testified before the ALJ and indicated to her doctors that she lacks energy, the ALJ noted that Plaintiff is able to engage in a wide range of activities on a daily basis, such as cleaning, laundry, shopping and cooking. (*Id.*). Lastly, the ALJ noted that while Dr. Schiller indicated that Plaintiff is unable to engage in any meaningful employment, the ALJ dismissed this opinion due to no underlying findings to support the post-polio diagnosis, no restrictions by Plaintiff's ophthalmologist, and Plaintiff's thyroid condition is well controlled with proper medication. (Tr. 16).

16

Turning to Step Four, the ALJ determined that Plaintiff is unable to perform any of her past relevant work. Specifically, the ALJ found that "since even the [Plaintiff's] least demanding past job required her to perform work activities inconsistent with the residual functional capacity determined above" Plaintiff is not capable of performing past relevant work. (*Id.*). The finding of the ALJ as to Step Four of the Analysis is not challenged by either party and the court finds no reason to disturb this finding. The ALJ's determination as to Step Four of the Analysis is affirmed.

E.    Step Five: Is the claimant capable of performing any work existing in substantial numbers in the national economy?

At Step Five, the ALJ found that although Plaintiff's RFC did not allow her to perform past relevant work, there existed a significant number of jobs in the regional economy that Plaintiff can perform. In finding so, the ALJ first determined that Plaintiff's age (sixty one at the time of the hearing) falls with the "close to retirement age" category, but from August 25, 2000 to March 12, 2001, Plaintiff was in the "advanced age" category. (Tr. 16). Plaintiff has a high school education, and while Plaintiff's past relevant work provided some skills, those skills do not transfer to other occupations within Plaintiff's RFC. Further, the ALJ determined that Plaintiff is limited to a narrowed range of medium work, and if Plaintiff were capable of a full range of "medium" work, Rule 203.07 of the Medical-Vocational Guidelines would apply and a direct finding of "not disabled" would follow. However, because Plaintiff's RFC limitations do not exactly coincide with medium work, the ALJ consulted a vocational expert. (*Id.*). The vocational expert, when asked whether a hypothetical individual with Plaintiff's vocational characteristics and RFC could perform any jobs within a reduced range of "medium" work, stated that an individual could perform jobs such as machine operator and packer, 20,000 which exist in the six county Chicago metropolitan area.

17

(*Id.*).

Plaintiff makes two arguments, although they are interrelated, against the ALJ's ultimate conclusion: 1) that the ALJ failed to properly apply the Medical Vocational Guidelines and Social Security Regulations with regard to analysis of RFC; and 2) that the ALJ failed to reconcile the vocational expert testimony that would have dictated a finding of disability. (Pl.'s Mot. for Summ. J. at 4). This court will address both simultaneously.

If Plaintiff were able to perform a full range of medium work, Rule 203.07 of the Medical Vocational Guidelines would direct a finding of "not disabled." Plaintiff is not able to perform at such a level.[4] If Plaintiff were only able to perform a full range of light work, Rule 202.06 of the Medical Vocational Guidelines would direct a finding of "disabled." The ALJ believed that Plaintiff was able to perform a full range of light work and then some. Thus, the conundrum.

Taking a look at the requirements necessary to perform light work versus medium work, it appears Plaintiff is correct. While medium work requires lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds, light work requires lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. 20 CFR § 404.1567 (b-c). However, what Plaintiff fails to recognize is that the ALJ specifically stated that Plaintiff does not fall within the full range of medium work range and does not quite fit in the light work range, and thus, the ALJ turned to a vocational expert. And, as properly pointed out by Defendant, the Seventh Circuit has clearly stated that "Where an individual's exertional RFC

---

[4]20 CFR 404.1567(b) (Light work) states, *inter alia*, "[l]ight work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 CFR 404.1567(c) (Medium work) states, *inter alia*, [m]edium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.

... does not coincide with the definition of any one of the ranges of work as defined in ... the regulations, the occupational base is affected ... ." *DeFrancesco v. Bowen*, 867 F.2d 1040, 1045 (7th Cir. 1989)(citing SSR 83-12). Further, where the occupational base has been affected, the Seventh Circuit has stated that "the adjudicator will need to consult a vocational resource." *Id.* The ALJ did so and the vocational expert provided a significant number of jobs in the six county Chicago area that Plaintiff could perform.

Plaintiff further argues that the twenty pound restriction determined by the ALJ is in error given the numbness and tingling in Plaintiff's left fingers. Specifically, Plaintiff argues "the ALJ must have gleaned an ability to lift 20 lbs. frequently from a Medical Source Statement of ability to do work Related Activities executed by an Opthamalogist." (Pl.'s Mot. for Summ. J. at 7)(citing Tr. 224-227). This appears to be both correct and incorrect. Looking at the medical record, Plaintiff is correct that there is no other mention of twenty pounds except by Dr. Guo. However, there is also no mention that Plaintiff cannot lift twenty pounds. There may be some evidence that Plaintiff is capable of lifting no more then twenty pounds. For example, Plaintiff testified that she goes grocery shopping a couple times a week and is able to carry a couple bags at a time. (Tr. 38). Additionally, C. Enos reported that Plaintiff had no problem or pain when putting her arms up to shoulder level to show how she stocked shelves. (Tr. 122). Lastly, there is no medical record presently before this court that contradicts a finding that Plaintiff can lift up to twenty pounds.

With regards to Plaintiff's numbness and tingling in her left hand, the medical records before this court contain only one instance where Plaintiff's left hand was at issue. (Tr. 154-155). On that occasion, Dr. Guo recommended that Plaintiff wear mittens and required no follow-up testing or treatment. (*Id.*). Even more surprising is that on one occasion, C. Enos reported that Plaintiff had

no difficulties with, among other things, using her hands or writing. (Tr. 122). While this court too questions the use of an Opthamalogist to determine Plaintiff's lifting/carrying limitation, substantial evidence exists in the medical record as a whole to justify a finding that Plaintiff can lift twenty pounds. That being said, this court has no choice but to that find substantial evidence exists to support both the ALJ's finding and the assessment of the vocational expert, who determined that a substantial number of jobs exist which Plaintiff can perform.

## VII.  CONCLUSION

For the reasons stated above, the ALJ's decision to deny benefits to Plaintiff is sustained. The ALJ is affirmed at all steps of the disability determination process as outlined above. Plaintiff's Motion for Summary Judgment to the administrative record and pleadings is denied. Summary Judgment is granted to Defendant.

**ENTER:**

P. MICHAEL MAHONEY, MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

DATE: 11/17/03